IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| A.B., as guardian *ad litem* for her minor child, C.D., <br><br> Plaintiff, <br> v. <br><br> VINELAND BOARD OF EDUCATION, *et al.*, <br><br> Defendants. | Civil No. 17-11509 (RBK/KMW) <br><br> **OPINION** |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint. (ECF No. 9.) Defendant has challenged Plaintiff's complaint with several immunity defenses and also moves for dismissal for failure to state a claim. Because Plaintiff's complaint contains procedural defects that obscure what claims are in the complaint, the Court declines to address most of Defendants' immunity arguments at this time. However, Defendants' motion is **GRANTED IN PART** with respect to Plaintiff's emotional distress claims.

I. BACKGROUND

Plaintiff A.B. brings this action on behalf of her minor daughter, C.D. During the 2015-2016 school year, C.D., then thirteen and in the eighth grade, was enrolled in Rossi Intermediate School (the "School"), which is operated by the Vineland Board of Education (the "Vineland Board"). (Compl. at ¶ 14.)

1

### A. C.D.'s Interactions with Her Teacher, Richard Super

This case is about improper sexual contacts between a teacher and his thirteen-year-old student. Richard Super, an adult man, had been one of C.D.'s teachers at the School for at least two years. (Compl. at ¶ 55.) During the 2015-2016 school year, Super used his school-issued email to transmit thousands of sexually explicit email messages to C.D. (Compl. at ¶ 56.) The relationship between Super and C.D. was so conspicuous that other students were aware of it during the 2015-2016 school year and often made comments about the relationship in the hallways in class and to C.D. (Compl. at ¶ 63.) For instance, one asked C.D., about "the Super thing . . . if you don't wanna talk about it fine but is it getting better"? (*Id.* at ¶ 64.)

Many of C.D. and Super's conversations are unsettling. For example,

| | |
|---|---|
| [Super]: | No to what? I'm confused BabyMetal. And just the whole 7th period thing. |
| [C.D.]: | Oh I mean like people are just saying shit. And I need someone to talk to. |
| C: | can I please listen to music |
| S: | What are they saying now BabyMetal? |

\* \* \*

| | |
|---|---|
| C: | Hey daddy slipknot we have to talk about things. |
| S: | What's up? |
| C: | People are saying this about us daddy |
| C: | They are a little bad but that's what they think of us I guess |
| S: | Oh geeze like what? |
| C: | People think I do anything forceful with u. And that I skip class to come see u alone in ur room. T sum it all up, people we're . . . ya know doing???? You deserve to know but that's what people keep saying I say to fuck off and leave out bc he's innocent or I say ur a bitch and that's completely nasty and will never happen, but I hope our relationship will end bc of this dad?!!!!! |
| C: | I'm sorry dad but u NEED to know |

(Compl. at ¶ 63.) Several exchanges were of a sexual nature. For example:

| | |
|---|---|
| S: | BTW my cheek was very heartbroken this week. I got him all excited and then he got shut down. (sad face) |

2

| | |
|---|---|
| C: | Y was he all excited d |
| S: | Cause someone was supposed to give him something and then it never matured. I had to let him down easy. |
| C: | Aww ill kiss u on Monday for sure . . . can I get one (pause)? |
| S: | It'll be when you least expect it (blushing face) |

* * *

| | |
|---|---|
| S: | Thanks I try. I wrote BB under the SS on your paper. Know what that means? And wont say unless you guess right. (blushing face) (winky face) |
| C: | I didn't knotice but I don't wanna guess bc ima get it rong so tell me d |
| S: | just one guess please!! (praying hands). Two words that start with B and they have do with you. |
| C: | Uhhhhhhh big baby, beautiful boy, big butt, big boobs, boring bitch, idk lol |
| S: | Lol wow some of them work but you actually got half of it right. |
| C: | uhhhh baby? Butt? Boobs? Beautiful? . . . what? |
| S: | Two of them are correct just add a word to one of and bam it's it. |
| C: | uhhhh boobs butt, beautiful baby, beautiful boobs, idk |
| S: | Second one my B |
| C: | Awww daddy thank u. . ur so sweet!! That was in my very high pitched baby voice btw lol |

* * *

| | |
|---|---|
| S: | just took off my pants and shirt. Lol nah just chilling talking to you. Sweating lol |
| C: | YAY we're naked buddies!! Watt r u doing having fun? |
| S: | Loads and loads of fun! ! (smiley face) |

(Compl. at ¶ 98.) Plaintiff's complaint contains several other disconcerting exchanges. (*Id.*) These messages were sent at virtually all times, through the late hours of the night and early hours of the morning. (*Id.* at ¶¶ 70, 73.) On one Friday they exchanged 287 messages. (*Id.* at ¶ 73.)

This relationship was not limited to texting: C.D. would draw Super pictures and bring him snacks and breakfast. (*Id.* at ¶¶ 68-69.) C.D. once kissed him on the cheek, and they exchanged a pair of t-shirts as gifts at one point. (*Id.* at ¶ 67.)

3

## B. The School's Awareness

Plaintiff claims numerous individuals were aware of these interactions. She has sued the Vineland Board of Education, which owns and operates the Rossi Intermediate School, as well as that school's superintendent, Dr. Mary Gruccio; principal, Tammy Monahan; and assistant principal, Michael Sullivan. Defendants are alleged to have the authority and responsibility to address discrimination and harassment in the school. They are also alleged to have had actual knowledge of such harassment and to have failed to adequately respond to it. Specifically, Plaintiff alleges that Defendants knew of Super's tendency to (a) bring C.D. breakfast; (b) sit with C.D. at lunch; (c) visit C.D.'s gym class; (d) step out of class to talk to C.D. in the hallway; (e) talk to C.D. via email; and (f) give C.D. extra attention during class time. (Compl. at ¶ 41.) Plaintiff alleges these activities violated the Vineland Board's policies.

Plaintiff maintains that Defendants should have been aware of Super's misconduct and harassment of a middle-school girl because of its conspicuous nature, and that through their inaction this was allowed to occur. For example, during a January 14, 2016 deposition, Dr. Gruccio stated:

> Q: If a student is the subject or victim of sexual assault by a staff member from a school do you agree that that student is being deprived of the education to which he is entitled?
> A [Gruccio]: Not necessarily, no.

(Compl. at ¶ 50; Gruccio Dep. 64:13-17.) It is further alleged—without specific textual support—that Superintendent Dr. Gruccio had previously averred that a young male student could be a "willing" participant in sexual activities with a staff member, thereby making a "choice" to participate in sexual activity with a teacher. (Compl. at ¶ 52.)

Principal Monahan observed Super's relationship with C.D. and spoke to an officer of the Vineland Police Department ("VPD") about it on June 2, 2016. (*Id.* at ¶ 103.) She noted that she

had called Super into her office on May 3, 2016 to speak to him about his meetings with C.D. on two separate occasions during lunch. (*Id.*) She also told Super that the interactions were not "normal" and that she instructed Super to cease interacting with C.D. (*Id.*) She stated to another detective that she had a "hunch" and a "feeling" that something was awry. (*Id.* at ¶ 104.) Monahan stated she had spoken to Super about this on two separate occasions. (*Id.* at ¶ 105.)

Other teachers noticed worrying behavior. One teacher in the school, Stephanie Coia, had noticed that C.D. was not doing her work in class but was instead vigorously typing. (*Id.* at ¶ 109.) Every time Coia or an assistant would try to see who C.D. was talking to, she would close the computer. (*Id.*) Coia also noticed that Super had formerly spent his free period with the other teachers, but that instead of doing so he spent it in the gymnasium weight room. (*Id.* at ¶ 112.) This free period coincided with C.D.'s gym period. (*Id.*) Other teachers made the same observation. (*Id.*) Coia also observed that C.D. always ate popcorn in class, and although C.D. stated it was her mother who gave it to her, Coia later heard C.D. mention to another classmate that it was Super who gave her the popcorn. (*Id.* at ¶ 113.)

C.D.'s math teacher, Natalie Quackenbush, also noted some irregularities. Super's classroom was adjacent to hers, and C.D. would always spend time with Super in the hallway between classes. (*Id.* at ¶ 115.) Quackenbush had noticed that C.D. would ask to use the restroom during class, apparently an excuse for her to step out to meet Super. (*Id.*) She once heard a student exclaim one day that C.D. was chatting with Super over her computer during class. (*Id.*) After asking C.D. and Super about this, they both denied the claim. (*Id.*) She, as well as Coia, observed that Super had ceased eating lunch with the other teachers and had started to each lunch with C.D. and the other students, where he sometimes sat with C.D. (*Id.*) She remembers having to tell C.D. to get to class and stop talking to Super. (*Id.*)

An aide from Super's classroom also noticed that C.D. and Super had a different handshake than the ones he and other students exchanged. (*Id.* at ¶ 116.)

Things began to transition to crisis on May 29, 2017. At a parent-teacher meeting, A.B., C.D.'s mother, met with several teachers—Andrea Massaro, Natalie Quackenbush, Stephanie Coia, and another—to discuss C.D.'s poor performance in school. (*Id.* at ¶ 106.) Towards the end of the meeting the women asked Super to come into the room and asked why C.D. was doing poorly in all her classes save his. A.B. and Coia later recalled that Super was nervous and would not make eye contact. (*Id.*) It appears he lacked a good explanation and that this may have alarmed him, as a few days later on a field trip, Coia observed that Super was walking around like a "lost puppy" during an 8th grade class trip to Wildwood, New Jersey on June 2, 2016. (*Id.* at ¶ 110.) She noted that Super was avoiding his colleagues, instead of his usual friendliness. (*Id.*)

Although not perfectly clear in the complaint, this eventually came to the attention of the Cumberland County Prosecutor's Office. Its investigation revealed criminal abuse: some 4,600 messages between C.D. and Super on the school email server during a two-month period. (*Id.* at ¶¶ 70, 73.) Prosecution commenced, and on May 18, 2017, Super pleaded guilty to a fourth-degree charge of Cruelty and Neglect of a Child, pursuant to N.J. Stat. Ann. § 9:6-3.

### C. The Vineland Board's Policies and Procedures

The Vineland Board has policies prohibiting teachers from engaging in any communication with students that is unrelated to school. This includes inappropriate comments, language, and conduct of a sexual nature with students. (Compl. at ¶ 59.) Plaintiff also alleges that the Vineland Board established policies that imposed an obligation on school administrators to monitor for

compliance with school policies. (*Id.* at ¶ 74.)[1] All of the 4,600 communications between Super and C.D. were made using the school's email system and servers.

The Vineland Board used software, the Barracuda Message Archiver (the "Barracuda program"), to monitor computer communications. (Compl. at ¶ 76.) The Barracuda program allows administrators to sort through a message archive to compile relevant messages. (*Id.* at ¶ 79.) Users can specify organizational policies in the program, including defining when it is acceptable to send messages during certain times of day or containing inappropriate content or forbidden topics. (*Id.* at ¶ 86.) The program comes with three default policy definitions, including Personal Email, Personal Info, and Foul Language. (*Id.* at ¶¶ 91-95.) These may be modified or added to, and are automatically updated regularly. (*Id.*) As a default setting, the Barracuda program reports on the growth of the archive, policy violations, and archive traffic. (*Id.* at ¶ 81.) It was also capable of providing traffic and policy statistics, such as the amount of overall email traffic and whether messages have triggered a particular policy category. (*Id.* at ¶ 83.)

Plaintiff alleges that the Barracuda program allowed Defendants to create searches on virtually every aspect of a message, including its body, recipients and senders, attachment types, and date. (*Id.* at ¶ 90.) Plaintiff alleges that under the default policy definitions, C.D.'s communications with Super would have resulted in a notification to all administrators of the Barracuda network. (*Id.* at ¶ 96.)

### D. Procedural History and Claims

Filed on November 10, 2017, Plaintiff's lengthy, somewhat disjointed complaint brings a claim (or claims, as we'll see) nominally under Title IX, 20 U.S.C. § 1681(c) (Count I); a claim of

---

[1] *See also* Compl. Ex. D. ("School district personnel will monitor networks and online activity to maintain the integrity of the networks, ensure their proper use, and ensure compliance with Federal and State laws that regulate Internet safety.").

intentional infliction of emotional distress ("IIED") (Count II); a claim of negligent infliction of emotional distress ("NIED") (Count III); a claim of respondeat superior premised on the negligence of Richard Super (Count IV); a claim of negligent supervision and training (Count V); a claim of sexual harassment brought under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12 *et seq.* (Count VI); and claims under 42 U.S.C. § 1983 (Counts VII and VIII). Defendant has since moved to dismiss the complaint.

## II. JURISDICTION

Plaintiff brings claims under Title IX and § 1983, placing this matter within the Court's federal-question jurisdiction pursuant to 28 U.S.C. § 1331. The related state-law claims are properly before this Court under 28 U.S.C. § 1367.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d. Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It is not for courts to decide at this point whether the non-moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Prop., Inc.*, 311 F.3d 198, 215 (3d Cir 2002).

In making this determination, the Court analyzes each claim in three steps. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

### B. Rule 12(b)(7)

Rule 12(b)(7) provides that an action may be dismissed due to the plaintiff's failure to join an indispensable party pursuant to Rule 19. Federal Rule of Civil Procedure 19, in turn, provides the standard the Court must employ in determining whether a case may proceed without the joinder of certain persons, and requires that the Court undertake a three-part analysis to evaluate the indispensability of the absent parties. The Court must decide (1) whether it is necessary that the absent party be joined; (2) whether it is possible for the absent necessary party to be joined; and (3) if joinder of the absent party is not feasible, whether "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." *Id.*; *see also Prader v. Science Dynamics Corp.*, No. 99–5303, 2000 U.S. Dist. LEXIS 18666, at *13 (D.N.J. Dec. 19 2000). "If the party is indispensable, the action therefore cannot go forward." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399,

404 (3d Cir. 1993). The question of an absent person's indispensability is a fact-specific issue that "can only be determined in the context of the particular litigation." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118 (1968).

IV. **DISCUSSION**

Defendants have asserted several defenses. First, they argue they are immune to Plaintiff's respondeat superior claim under the New Jersey Tort Claims Act ("TCA"), N.J. Stat. Ann. § 59:1-1 to 14-4. Second, Defendants argue they are immune to Plaintiff's claims under the TCA's provisions barring claims against public entities for failure to adopt or enforce a law, N.J. Stat. Ann. §§ 59:2-4 and 59:3-5. Third, they argue that Plaintiff has pleaded insufficient facts to establish a permanent loss of a bodily function, as required by N.J. Stat. Ann. § 59:9-2. Fourth, Defendants argue that Plaintiff has failed to allege facts sufficient to make out a claim of either intentional or negligent infliction of emotional distress. Fifth, Defendants have also moved for dismissal for failure to join a necessary party, Richard Super, pursuant to Fed. R. Civ. P. 19.

Plaintiff concedes the respondeat superior claim cannot proceed and has voluntarily dismissed it. (Opp'n at 8.) The Court, on its own motion, also finds that Count I is procedurally defective and must be dismissed without prejudice. With respect to Defendants' other arguments, the Court finds that Plaintiff has failed to state claims for emotional distress, that Super's interactions with C.D. establish a physical injury sufficient to withstand dismissal at the pleadings stage, and that Super is not a necessary party under Fed. R. Civ. P. 19.

A. **Count I of Plaintiff's Complaint Does Not Satisfy Federal Rule of Civil Procedure 10(b)**

Plaintiff's lengthy, 201-paragraph complaint contains some defects that make it difficult to discern the precise claims contained within it. Several counts of the complaint are discrete and

readily discernible, but Count I, at 117 paragraphs (exclusive of sub-paragraphs), defies easy categorization.

Rule 10(b) is "designed to achieve clarity and simplicity in the pleadings." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1324 (3d ed. 2004) (citing *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364 (11th Cir. 1996)). As Rule 10(b) makes clear, "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b). "The purpose of the requirement of separate counts is to clarify the issues and simplify the trial." *Williamson v. Columbia Gas & Elec. Corp.*, 186 F.2d 464, 469 (3d Cir. 1951); *accord Bautista v. Los Angeles County*, 216 F.3d 837 ("[S]eparate counts permit pleadings to serve their intended purpose to frame the issue and provide the basis for informed pretrial proceedings.").

Courts may require repleading pursuant to Rule 10(b) when three circumstances are present: "where multiple claims are asserted, where they arise out of separate transactions or occurrences, and where separate statements will facilitate a clear presentation." *Bautista*, 216 F.3d at 840–41 (9th Cir. 2000) (citing 5A Wright Miller, *supra*, § 1324). And when a complaint is brought against several distinct defendants, "separate statements with regard to each defendant are particularly helpful in apprising the individual defendants of claims pertaining only to them." Wright & Miller, *supra*, § 1324.

Count I of Plaintiff's complaint asserts multiple claims spread across 113 paragraphs and numerous sub-paragraphs. It is styled "Violations Pursuant to 20 U.S.C.A. § 1681(c), Title IX, Education Amendments of 1972." The Court thus surmises that Plaintiff brings a claim pursuant to 20 U.S.C. § 1681(c). Yet this specific provision merely defines "educational institution" in Title IX of the Civil Rights Act—alas, a definition does not provide a cause of action any more than

11

does a dictionary. And while the Court could construe Count I as a Title IX sexual harassment claim under 20 U.S.C. § 1681(a), this quickly becomes untenable. Peering 20 pages deeper into Count I, Plaintiff alleges numerous failures on the part of Defendants. These are usually without reference to specific statutory or regulatory authority, but when a legal authority is articulated, it is often on divergent and diverse authorities under *both* state and federal law. This thus calls into question whether this is solely a Title IX claim to begin with.

For example, Plaintiff alleges that under 34 C.F.R. § 106.8(a), Defendants were obliged, and failed, to communicate to students and their parents the identity of a Title IX coordinator, and indeed failed to even appoint or designate one at all. But also within Count I is an allegation that Defendants failed to report acts of child abuse to New Jersey's Child Protection and Permanency Division, as required under N.J. Stat. Ann. § 9:6-8.10. Count I also contains allegations that the Vineland Board violated several of its own policies and failed to supervise Richard Super, which appears to implicate tort law and the relevant standard of care. In sum, Count I appears to draw on at least three separate bodies of law—Title IX, New Jersey statutory law, and New Jersey's common law of torts—and thus at least three separate causes of action.

The Court also notes that Count I's hundreds of paragraphs and sub-paragraphs involve several defendants in several different transactions or occurrences. Count I sets forth a panoply of events ranging from, *inter alia*, the Barracuda messaging system, an alleged failure to appoint a Title IX coordinator, disturbing messages between Super and C.D., interviews with teachers who are not parties to this suit, and the Vineland Board's internal policies. While Plaintiff has presented these facts in a narrative form, Count I does not present a coherent statement of the claims brought against Defendants.

In short, there is no doubt that repleading "will facilitate a clear presentation." *Bautista*, 216 F.3d at 841. As Judge Stengel has pithily remarked, "Federal Rule of Civil Procedure 10(b) clearly states, 'each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense.' As such, *there should be a heading labeled Count 1 followed by a recitation of the elements of the claim and the facts which plausibly plead each element*." *Rutt v. City of Reading, PA*, 2014 WL 988570, at *2 (E.D. Pa. Mar. 13, 2014) (emphasis added). Count I does this in part, but ultimately fails to establish the elements of the claim (or claims) it purports to bring and instead unspools the entire history of the case. While Count I certainly presents an unflattering picture, the Federal Rules of Civil Procedure require more than an unpleasantly evocative Rorschach test to put Defendants on notice as to the claims against them. The Court finds that Plaintiff must replead to proceed with Count I's claim (or claims), and that at this time it is consequently premature to rule on whether Defendants are entitled to immunity for whatever claims are within Count I.

### B. Immunity to Pain and Suffering Awards under N.J. Stat. Ann. § 59:9-2(d)

Defendants argue they are immune to suit because Plaintiff has not established a permanent loss of a bodily function within the meaning of the New Jersey Tort Claims Act ("TCA"). We disagree.

The TCA provides that in a suit against a public entity or public employee, a plaintiff shall not be awarded pain and suffering damages "resulting from any injury" except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." N.J.S.A. 59:9-2(d). *Jablonowska v. Suther*, 195 N.J. 91, 116 (2008). It is undisputed that Defendants are public entities or public employees within the meaning of the TCA.

Psychological injuries are not necessarily barred by the TCA. The New Jersey Supreme Court has noted that with "present-day understanding of psychological injuries," the "mind . . . is as much a part of the body as the back, a leg, a hand, or a finger." *Id.* at 116 (citing *Collins v. Union County Jail*, 150 N.J. 407, 423 (1997)). As such, the TCA does not treat psychological injuries differently from physical injuries "when those physical injuries arise in a context similar to that which precipitated plaintiff's injuries." *Id.* (alterations omitted). Injuries including post-traumatic stress disorder are therefore within the scope of the TCA when they arise in the same context as a physical injury. *See Collins*, 150 N.J. at 413 (holding plaintiff's claim of permanent psychological injury in form of posttraumatic stress disorder resulting from being raped by corrections officer may constitute a "permanent loss of a bodily function" even absent residual physical injury); *see also Frugis v. Bracigliano*, 351 N.J. Super. 328, 798 A.2d 614, 629 (N.J. Super. Ct. App. Div. 2002) (finding allegations of sexual abuse sufficient when accompanied by permanent post-traumatic stress disorder), rev'd on other grounds, 177 N.J. 250 (2003); *Joyce v. City of Sea Isle City*, No. CIV. 04-5345RBK, 2008 WL 906266, at *24 (D.N.J. Mar. 31, 2008) (finding that report of medical expert that plaintiff suffering from post-traumatic stress disorder and severe depression resulting from "traumatic experiences of racial discrimination and inappropriate arrest" sufficed to surpass the threshold of § 59:9-2(d)).

The question before the Court is whether C.D. has pleaded injuries that are either purely physical or are instead emotional injuries with some nexus to a physical injury. Defendants argue that Plaintiff has not pleaded that she was contacted physically by either Defendants or Richard Super. This is not entirely correct. The complaint presents texts from Super that unambiguously solicit kisses from C.D., a minor. Digital solicitation of kisses from a minor is not physical, that much is true—but Plaintiff *has* pleaded that C.D. once kissed Super on the cheek. (Compl., ¶ 67.)

14

In the normal course of events adult men do not ask 13-year-old girls for kisses. Nor does the law presume 13-year-olds act upon their own volition in such settings, particularly when asked by an adult to do so. Common decency and the law alike observe "a societal recognition that, because a child lacks the capacity to give consent, sexual activity foisted upon that child by an . . . adult raises the irrebuttable inference that the adult intended to harm that child." *Shelby Cas. Ins. Co. v. H.T.*, 391 N.J. Super. 406, 416 (App. Div. 2007) (citing *Aetna Life & Casualty Co. v. Barthelemy*, 33 F.3d 189, 193 (3d Cir. 1994)). "This rationale gives recognition to laws that protect minors not only from offenders but from themselves." *Id.* That C.D. kissed Super, and not vice versa, is therefore immaterial; either way, it was Super's physical involvement that counted here. The complaint contains alarming allegations of an inappropriate physical relationship between Super and C.D. This suffices to establish the physical nexus necessary to proceed, at the motion to dismiss stage, with whether Plaintiff's psychological injuries are barred by the TCA.

Turning to those alleged psychological injuries, Plaintiff alleges she has suffered "permanent emotional and physical injuries" including anxiety, depression, post-traumatic stress disorder, embarrassment, and humiliation, for which she has and is likely to incur medical expenses and psychological treatment. (Compl., ¶¶ 129, 196.) Given the facts of this case, this is eminently plausible, both now and in the years to come. The Court finds that as a matter of law Plaintiff has pleaded injuries sufficient to clear the physical injury bar set by the TCA.

### C. Emotional Distress Claims

#### 1. *Intentional Infliction of Emotional Distress*

To prove a claim for intentional infliction of emotional distress, Plaintiff must show: (1) Defendants acted intentionally or recklessly; (2) the Defendants' conduct was extreme and outrageous; (3) the Defendants' actions proximately caused Plaintiff's emotional distress; and (4)

15

Plaintiff's emotional distress was "so severe that no reasonable man could be expected to endure it." *Buckley v. Trenton Sav. Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988) (quoting Restatement (Second) of Torts § 46 cmt. j (Am. Law Inst. 1965)). To be extreme and outrageous, a plaintiff must show that the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts, § 46 cmt. d (Am. Law Inst. 1965)). The severity of emotional distress is a question of law and fact, and the court must initially determine whether, as a matter of law, such emotional distress can be found. *Buckley*, 544 A.2d at 864.

Plaintiff has alleged no facts indicating that Defendants—the Vineland Board, Dr. Gruccio, Monahan, and Sullivan—engaged in conduct that could be characterized as extreme and outrageous. The "elevated threshold" for finding outrageous conduct is only satisfied in extreme cases under New Jersey law. *Griffin v. Tops Appliance City, Inc.*, 766 A.2d 292, 296 (N.J. Super. Ct. App. Div. 2001). This high level of outrageousness is not evident from the face of the complaint. For example, in *Lockhart v. Willingboro High School*, a 17-year-old student alleged she had been sexually assaulted by another student inside an empty classroom while school was in session. 170 F. Supp. 3d 722, 727 (D.N.J. Mar. 31, 2015). With regard to a teacher and assistant principal who had been sued by the victim for their failure to prevent this from happening, the court found that there were no facts that could support an inference of "intentional and outrageous conduct." *Id.* at 738-39. For purposes of this claim, this case is not materially different; nothing in the complaint indicates the Defendants recklessly allowed or intended for any of this to happen. The Court finds that Plaintiff has failed to state a claim for intentional infliction of emotional distress.

*2. Negligent Infliction of Emotional Distress*

New Jersey law recognizes two stand-alone theories of NIED. *Jablonowska v. Suther*, 195 N.J. 91, 104 (2008); *Angle v. United States*, No. CIV.A. 12-2495 JLL, 2012 WL 6708165, at *6 (D.N.J. Dec. 21, 2012) ("The Supreme Court of New Jersey has explained that there are two general instances in which a plaintiff may maintain a claim for negligent infliction of emotional distress."). These are (1) the "zone of danger" theory, where the plaintiff is located within a zone of risk created by the defendant's negligent conduct, and (2) the "bystander" theory allowing recovery for witnessing the death or serious injury of a close family member. *Id.* The "zone of danger" theory is plainly a non-starter; as the United States Supreme Court explained in *Consolidated Rail Corp. v. Gottschall*, 512 U.S. 532, 547–48 (1994), "the zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of harm by that conduct." *See also Barella v. New Jersey Transit Rail Operations*, 2017 WL 85571, at *1 (N.J. Super. Ct. App. Div. Jan. 5, 2017) (citing same). Plaintiff simply wasn't within any conceivable zone of danger. This theory cannot sustain her claim.

The second theory requires Plaintiff to prove (1) the death or serious physical injury of another was caused by defendant's negligence; (2) a marital or intimate familial relationship existed between plaintiff and the injured person; (3) she had observed the death or injury of the victim at the scene of the accident; and (4) she had suffered severe emotional distress. *Portee v. Jaffee*, 84 N.J. 88, 101 (1980). Among other legally significant shortcomings, this case does not involve the death or serious physical injury of a close relative. A *Portee* claim therefore cannot be sustained either. *See also Hayward v. Salem City Bd. of Educ.*, No. CV 14-5200 (JBS/AMD), 2016 WL 4744132, at *12 (D.N.J. Sept. 12, 2016) ("It is plain that Plaintiff cannot succeed on this

[NIED] claim, because she complains only of the search performed on her and her belongings, and not her witnessing of a traumatic injury to another person.").

Undeterred, Plaintiff takes a different tack: she argues this is a "direct" NIED claim, i.e., that Plaintiff was directly injured by Defendants and that this entitles her to damages. This, however, is not a stand-alone tort claim, but rather a damages question that is parasitic on another tort. If Plaintiff prevails on her other tort claims and can establish a proximately caused physical injury, she may seek damages for emotional distress. *See Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 76 (2011) (discussing evolution of the two theories of stand-alone NIED claims from the previous "physical impact" regime); *Mauro v. Raymark Indus., Inc.*, 116 N.J. 126, 137 (1989) (noting that a plaintiff who sustained a physical injury can recover for emotional distress without bringing a separate NIED claim). An NIED claim is not a separate cause of action save for the two theories outlined above. As such, we find that Plaintiff has failed to state a claim for the negligent infliction of emotional distress.

### D. Failure to Join a Necessary Party

Defendants argue that Plaintiff has failed to join Richard Super to this action. They contend that he is a necessary party and that his omission mandates dismissal. We disagree.

"It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.,* 498 U.S. 5, 7 (1990); *see also Huber v. Taylor*, 532 F.3d 237, 249–50 (3d Cir. 2008) (finding same, and noting "an Advisory Committee Note to Rule 19(a) explicitly states that subdivision (a) of the rule 'is not at variance with the settled authorities holding that a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability'"). This is a question of federal law solely within the scope of Fed. R. Civ. P. 19. *See Provident Tradesmens Bank*, 390 U.S. at 125

("in a diversity case the question of joinder is one of federal law"); *see also* Wright & Miller, *supra*, § 1603.

Defendants' briefing, a recital of policy considerations and caselaw from the 19th century, does not present much reason to deviate from this rule. Defendants' primary contention is that the TCA's rules for comparative fault require Super to be joined to this action as a joint tortfeasor. "[I]n any case where a public entity or public employee acting with the scope of his employment is determined to be a tortfeasor in any cause of action along with one or more other tortfeasors, the public entity or public employee *shall be liable for no more than that percentage share of the damages which is equal to the percentage of negligence attributable to that public entity or public employee . . .*" N.J. Stat. Ann. § 59:9-3.1 (emphasis added). *See also Frugis*, 177 N.J. at 276 (discussing history and statutory construction of the TCA). Defendants note that Super was criminally convicted for his actions and would therefore be exposed to civil liability if he were a party. As such, Defendants argue any negligence or intentionally tortious activity attributable to Super would be considered in any action against Defendants, as his fault will be implicated by proceedings.[2]

Whether § 59:9-3.1 itself requires another tortfeasor to be joined appears to be a novel question, but courts that have considered the effect of similar statutes have concluded they do not in the absence of specific provisions to the contrary. In *Selchert v. State of Iowa*, 420 N.W.2d 816, 821 (Iowa 1988), for example, the court was "not persuaded" that the enactment of a comparative fault statute "effectively repealed the rules of civil procedure permitting, but not requiring, joinder of claims and parties at the plaintiff's discretion." *See also Pippert v. Gundersen Clinic, Ltd.*, 300

---

[2] Defendants also argue that Richard Super's homeowners insurance may cover his liability with respect to his attempting to seduce a 13-year-old girl. (Reply at 13.) This seems unlikely and not altogether relevant to whether Super is a necessary party.

F. Supp. 2d 870, 880 (N.D. Iowa 2004) (citing same). We find nothing to indicate that the New Jersey legislature intended a comparative default scheme of apportionment to require joinder of any party potentially affected. But even if it did, this is a question not of state substantive law but of federal procedure, which is, of course, effectively unrepealable by the action of New Jersey law. *Cf.* Wright & Miller, *supra*, § 1623 ("Under the substantive law of many states, one tortfeasor has no right to compel the joinder of other tortfeasors who were not sued by plaintiff in the original action. The federal courts will not alter this practice by requiring joinder under Rule 19, even though that might be both desirable and feasible.").

In short, the TCA does not mandate joinder of another potential tortfeasor in federal court. *See VFS US LLC v. Vaczilla Trucking, LLC*, No. CV 15-02226, 2015 WL 7281619, at *15 (E.D. La. Nov. 16, 2015) (noting in dicta that the issue of comparative fault would only make a party a "permissive co-defendant," pursuant to *Temple*, 498 U.S. at 6). The Court finds that Plaintiff is still "the master of the complaint" and that Richard Super is not a necessary party. *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002).

V. CONCLUSION

For the reasons stated above, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. An order follows.

Dated: June 27, 2018　　　　　　　　　　　　　　　　　　　s/ Robert B. Kugler
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　ROBERT B. KUGLER
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge