**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| A.B., as guardian *ad litem* for her minor child, C.D., | : : : | |
| Plaintiff, | : : | Civil No. 17-11509 (RBK/KMW) |
| v. | : : | **OPINION** |
| VINELAND BOARD OF EDUCATION, *et al.*, | : : : | |
| Defendants. | : : : : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the motion to dismiss of the Vineland Board of Education, Superintendent Dr. Mary Gruccio, Principal Tammy Monahan, and Assistant Principal Michael Sullivan ("Defendants"). (Doc. No. 25.) Defendants seek dismissal of Counts I, II, and III of Plaintiff's Amended Complaint (Doc. No. 19 ("Am. Compl.").) For the reasons below, Defendants' motion is **GRANTED**.

## I.    BACKGROUND[1]

This case is about improper sexual contacts between a teacher and his thirteen-year-old student, C.D. During the 2015-2016 school year, C.D., then thirteen and in the eighth grade, was enrolled in Rossi Intermediate School (the "School"), which is operated by the Vineland Board. (Am. Compl. at ¶¶ 15–17.) Based on the teacher's misconduct, Plaintiff A.B. brought this action

---

[1] On this motion to dismiss, the Court accepts as true the well-pleaded facts in the Amended Complaint and construes them in the light most favorable to Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

on behalf of her minor daughter, C.D., against the Vineland Board, Superintendent Gruccio, the School's Principal Monahan, and its Assistant Principal Sullivan.  (*Id.* at ¶¶ 8–9.)

**A. C.D.'s Interactions with Her Teacher**

Richard Super, an adult man, used his status as one of C.D.'s teachers to induce C.D. into an inappropriate relationship.  (*Id.* at ¶¶ 21, 36.)  During the 2015-2016 school year, Super used his school-issued email to transmit thousands of sexually explicit email messages to C.D.  (*Id.* at ¶ 22.)

The relationship between Super and C.D. was so conspicuous that other students were aware of it during the 2015-2016 school year and often made comments about it in the hallways, in class, and to C.D.  (*Id.* at ¶ 37.)  One classmate, for instance, asked C.D. about "the Super thing . . . if you don't wanna talk about it fine but is it getting better"?  (*Id.* at ¶ 38.)

Many of C.D. and Super's conversations are unsettling.  For example,

| | |
|---|---|
| [Super]: | No to what?  I'm confused BabyMetal.  And just the whole 7th period thing. |
| [C.D.]: | Oh I mean like people are just saying shit.  And I need someone to talk to. |
| C: | can I please listen to music |
| S: | What are they saying now BabyMetal? |

*        *        *

| | |
|---|---|
| C: | Hey daddy slipknot we have to talk about things. |
| S: | What's up? |
| C: | People are saying this about us daddy |
| C: | They are a little bad but that's what they think of us I guess |
| S: | Oh geeze like what? |
| C: | People think I do anything forceful with u.  And that I skip class to come see u alone in ur room.  T sum it all up, people we're . . . ya know doing????  You deserve to know but that's what people keep saying I say to fuck off and leave out bc he's innocent or I say ur a bitch and that's completely nasty and will never happen, but I hope our relationship will end bc of this dad?!!!!! |
| C: | I'm sorry dad, but u NEED to know |

2

(*Id.* at ¶ 37.)  Several exchanges were sexual.  For example:

    S:        BTW my cheek was very heartbroken this week. I got him all excited and then he got shut down.  (sad face)

    C:        Y was he all excited d

    S:        Cause someone was supposed to give him something and then it never matured.  I had to let him down easy.

    C:        Aww ill kiss u on Monday for sure . . . can I get one (pause)?

    S:        It'll be when you least expect it (blushing face)

*    *    *

    S:        Thanks I try.  I wrote BB under the SS on your paper.  Know what that means?  And wont say unless you guess right.  (blushing face) (winky face)

    C:        I didn't knotice but I don't wanna guess bc ima get it rong so tell me d

    S:        just one guess please!! (praying hands).  Two words that start with B and they have do with you.

    C:        Uhhhhhh big baby, beautiful boy, big butt, big boobs, boring bitch, idk lol

    S:        Lol wow some of them work but you actually got half of it right.

    C:        uhhhh baby? Butt? Boobs? Beautiful? . . . what?

    S:        Two of them are correct just add a word to one of and bam it's it.

    C:        uhhhh boobs butt, beautiful baby, beautiful boobs, idk

    S:        Second one my B

    C:        Awww daddy thank u . . ur so sweet!!  That was in my very high pitched baby voice btw lol

*    *    *

    S:        just took off my pants and shirt.  Lol nah just chilling talking to you.  Sweating lol

    C:        YAY we're naked buddies!!  Watt r u doing having fun?

    S:        Loads and loads of fun! ! (smiley face)

(Compl. at ¶ 98.)  Plaintiff details several other disturbing exchanges.  (*Id.*)  These messages were sent at virtually all times, through the late hours of the night and early hours of the morning.  (*Id.* at ¶¶ 45–46.)  On one Friday they exchanged 287 messages.  (*Id.* at ¶ 46.)

This relationship was not limited to texting: C.D. would draw Super pictures and bring him snacks and breakfast. (*Id.* at ¶¶ 41–42.) C.D. once kissed him on the cheek, and at some point, they exchanged a pair of t-shirts as gifts. (*Id.* at ¶ 40.)

## B. The School's Awareness

Plaintiff claims that numerous individuals were aware of these interactions, including Defendants. (*E.g.*, *id.* at ¶ 98.) Plaintiff alleges, for example, that "Defendants actually knew" of Super's tendency to (a) bring C.D. breakfast; (b) sit with C.D. at lunch; (c) visit C.D.'s gym class; (d) step out of class to talk to C.D. in the hallway; (e) talk to C.D. via school email and computers; and (f) give C.D. extra attention during class time. (*Id.* at ¶ 18.) Plaintiff alleges that these activities violated the Vineland Board's policies. (*Id.* at ¶ 19.)

Principal Monahan observed Super's relationship with C.D. and—as part of an eventual police investigation into Super's behavior—spoke to detectives about it. (*Id.* at ¶ 70.) Monahan told the detectives that Super typically ate lunch with students, that she had spoken to Super on two separate occasions about having lunch with C.D., that she had spoken to Super about his interactions with C.D., which were "not normal," and that she had a "hunch" and a "feeling" that "something was not right." (*Id.* at ¶¶ 70–71, 161.) Super also told Monahan that C.D. used to cut herself. (*Id.* at ¶¶ 73–75.)

Other teachers noticed worrying behavior. Stephanie Coia, a science teacher, heard "rumors around the school and amongst students" that Super and C.D. were "having a relationship." (*Id.* at ¶ 85.) She also witnessed things herself, including that C.D. was not doing her work in class but was instead vigorously typing. (*Id.* at ¶¶ 72, 82.) Coia's assistant noticed the same. (*Id.* at ¶ 82.) And every time they would try to see who C.D. was talking to, she would close the computer. (*Id.*) Coia even noticed that Super would spend his free period

exercising in the gymnasium weight room at the same time as C.D.'s gym period, behavior that two other teachers confirmed. (*Id.* at ¶ 83.) Coia further observed that C.D. always ate popcorn in class, and although C.D. stated that her mother gave her the popcorn, Coia later heard C.D. mention to another classmate that Super gave it to her. (*Id.* at ¶ 84.) An aide from Super's classroom similarly noticed that C.D. and Super had a different handshake than the ones he exchanged with other students. (*Id.* at ¶ 87.)

C.D.'s math teacher, Natalie Quackenbush, noted similar irregularities. Because Super's classroom was adjacent to hers, Quackenbush noticed that C.D. always spent time with Super in the hallway between classes. (*Id.* at ¶ 86.) In fact, she remembers telling C.D. to stop talking to Super and to get to class. (*Id.*) Quackenbush also noticed that C.D. would ask to use the restroom during class, apparently an excuse to step out to meet Super, who spoke to C.D. in a "friendly," non-teacher-student manner. (*Id.*) One day, Quackenbush heard a student exclaim that C.D. was chatting with Super over her computer during class, though Super and C.D. both denied the claim. (*Id.*) And like Coia, Quackenbush observed that Super ate lunch with C.D. instead of other teachers. (*Id.*)

Staff members learned additional information about C.D. and Super around May 29, 2017. At a parent teacher conference with A.B., Coia, Quackenbush, and Andrea Massaro, a guidance counselor, learned that C.D. received poor grades in every class but Super's, so the women confronted Super about the discrepancy. (*Id.* at ¶ 72.)

Super's contact with C.D. was not the only teacher-student incident within the school district. In 2016, Superintendent Gruccio was deposed in "another matter of alleged discrimination" somewhere "within the school district stemming from [a] known inappropriate

relationship between a staff member and a student," though the incident's particulars are not provided.  (*Id.* at ¶ 105.)  Nevertheless, Gruccio testified in the following manner:

> Q:      If a student is the subject or victim of sexual assault by a staff member from a school do you agree that that student is being deprived of the education to which he is entitled?
> A:      Not necessarily, no.

(*Id.* at ¶ 108.)  It is further alleged—without specific textual support—that Gruccio previously averred that a young male student could be a "willing" participant in sexual activities with a staff member, thereby making a "choice" to participate in sexual activity with a teacher. (*Id.* at ¶¶ 109–111.)[2]  Plaintiff claims that Gruccio—as well as Monahan and Sullivan—"had actual knowledge of harassment and discrimination in the school's programs."  (*Id.* at ¶¶ 104, 115(c), 116(c).)

On June 2, 2018, Super's actions towards C.D. came to the attention of the Cumberland County Prosecutor's Office.  (*Id.* at ¶ 70.)  Its investigation revealed some 4,600 messages between C.D. and Super on the School's email server during a two-month period.  (*Id.* at ¶ 43.)  Police then arrested Super for Endangering the Welfare of a Child, and on May 18, 2017, Super pled guilty to a fourth-degree charge of Cruelty and Neglect of a Child.  (*Id.* at ¶¶ 89–90.)

**C.  The Vineland Board's Policies and Procedures**

Plaintiff invokes several of the Vineland Board's policies in this case.  The Vineland Board, for instance, has policies prohibiting teachers from engaging in any communication with a student that is unrelated to school.  (*Id.* at ¶ 24.)  This includes inappropriate comments, language, and conduct of a sexual nature.  (*Id.*)

---

[2] Although Plaintiff cites to a range of pages in Gruccio's deposition to support the allegations made, those pages appear missing from the exhibit cited on the docket.  (*Id.* at ¶ 111(citing Exhibit N).)

Plaintiff also alleges that the Vineland Board has other policies relating to use of its networks and technology. Specifically, Plaintiff alleges that the Vineland Board established a policy that required "[s]chool district personnel" to "monitor networks and online activity," though Plaintiff states that "[n]o school district personnel monitored the networks and online activity of Richard Super to ensure their proper use." (*Id.* at ¶¶ 29–30.) Plaintiff similarly alleges that the Vineland Board established a policy that "[a]ny pupil use of Internet 'live chat' capabilities will be directly supervised by an administrator, faculty, or staff member." (*Id.* at ¶ 32.)

The Vineland Board used software—the Barracuda Message Archiver—to monitor computer communications. (*Id.* at ¶ 48.) The Barracuda program allows those designated as system "Administrators" to sort through a message archive to compile relevant messages. (*Id.* at ¶ 50.) With the software, a person designated as an "Administrator" could keep track of violations of organizational policies and add themselves to an alert list when the program detected a violation. (*Id.* at ¶¶ 55–57, 63.) An "Administrator," for example, could set criteria to detect messages with forbidden content, excessive emails during business hours, or any other customized criteria. (*Id.* at ¶¶ 55, 64–65.) Plaintiff alleges that the Barracuda program allowed Defendants to create searches on virtually every aspect of a message, including its body, recipients and senders, attachment types, and date. (*Id.* at ¶ 58.)

The Barracuda program came with default settings. For example, it would flag excessive personal emails, messages that were personal in nature, and messages that contained foul language. (*Id.* at ¶¶ 55, 59.) It also produced default reports on the growth of the message archive, policy violations, and archive traffic. (*Id.* at ¶ 52.)

Plaintiff alleges that under the default settings, C.D.'s communications with Super would have resulted in a notification to all "Administrators" of the Barracuda network. (*Id.* at ¶ 61.) Although Plaintiff does not affirmatively and specifically allege that Defendants were designated as network "Administrators," Plaintiff alleges that "Defendants ignored all notifications or in the alternative failed to set [them] up." (*Id.* at ¶¶ 61–62.) Plaintiff also notes that Defendants are "administrative" officials within the school hierarchy. (*E.g.*, *id.* at ¶¶ 103, 115(b).)

Plaintiff maintains that Super cultivated his improper relationship with C.D. because of Defendants' failure to enforce its policies. (*Id.* at ¶¶ 35, 142–143.) Specifically, Plaintiff alleges that Defendants failed to monitor electronic communications, harassment, and other inappropriate staff conduct. (*Id.* at ¶ 143.) Plaintiff similarly alleges that Defendants took no steps to supervise and enforce its policy that required "School District personnel [to] monitor networks and online activity" to ensure proper use. (*Id.*) Finally, Plaintiff alleges that Defendants failed to comply with and enforce its suicide prevention policy once they learned C.D. cut herself. (*Id.*; *see also id.* at ¶¶ 74–81.)

### D. Procedural History and Claims

On November 10, 2017, Plaintiff filed her original Complaint in this matter. (Doc. No. 1.) In deciding Defendants' first motion to dismiss (Doc. No. 9), the Court dismissed, among other claims, whatever claim or claims Plaintiff attempted to assert in Count I, which was styled as a violation of Title IX, 20 U.S.C. § 1681(c). (Doc. No. 15 at 10–13.) Because Count I's hundred-paragraph long statement did "not present a coherent statement of the claims brought against Defendants," the Court directed Plaintiff to replead it consistent with Federal Rule of Civil Procedure 10(b). (*Id.* at 12–13.)

Plaintiff then filed her Amended Complaint, which Defendants now move to dismiss. (Doc. No. 25 ("Defs.' Br.").) Specifically, Defendants seek dismissal of the Amended Complaint's three federal claims: (1) violations of Title IX, 20 U.S.C. § 1681 (Count I); (2) "Civil Rights Violations Pursuant to 42 U.S.C. 1983 Substantive Due Process & State Created Danger" (Count II); and (3) *Monell* claims for failure to train, supervise, discipline, and creation of policy or custom. (Am. Compl. at ¶¶ 91–146.) The remaining counts arise under state law. (*Id.* at ¶¶ 147–187.) Plaintiff opposed Defendants' motion. (Doc. No. 29 ("Pl.'s Br.").)

## II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, a court "assume[s] the[] veracity" of well-pleaded factual allegations and determines "whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A complaint cannot survive when a court can only infer that a claim is merely possible rather than plausible. *Id.*

## III.    DISCUSSION

With the sufficiency of Plaintiff's federal claims in Counts I, II, and III at issue, the Court takes each claim in turn below.  But for the reasons that follow, it finds that none are plausibly alleged.  Accordingly, Counts I, II, and III are dismissed.

### A.  Title IX (Count I)

Once again, Plaintiff's Title IX claim is procedurally defective.  In its previous opinion, the Court required Plaintiff to replead Count I because it did "not present a coherent statement of the claims brought against Defendants" in violation of Federal Rule of Civil Procedure 10(b), which is designed to achieve clarity and simplicity in the pleadings.  (Doc. No. 15 at 10–13.)  As the Court explained, "Plaintiff's lengthy, 201-paragraph complaint contain[d] some defects that make it difficult to discern the precise claims contained within it," especially because Count I asserted "multiple claims spread across 113 paragraphs and numerous sub-paragraphs" involving "several defendants in several different transactions or occurrences." (*Id.* at 10–12.)

This time, Count I runs afoul of Local Civil Rule 15.1(b), which states that "a party who files an amended pleading in response to an Order authorizing the filing of that pleading to cure a defect in its pleading *shall file*," among other things, "a form of the amended pleading that *shall indicate* in what respect(s) it differs from the pleading that it amends, by bracketing or striking through materials to be deleted and underlining materials to be added."  L. Civ. R. 15.1(b) (emphasis added).  Yet Plaintiff did not properly indicate how the Amended Complaint differs from her original one—a procedure that is particularly important in light of Count I's

deficiencies as first pled. If Plaintiff chooses to amend this or any other claims, she must do so consistent with the Local Rules.[3]

### B. Section 1983 Substantive Due Process and State Created Danger (Count II)

Count II is also dismissed. As pled, Count II is titled "Civil Rights Violations Pursuant to 42 U.S.C. § 1983 Substantive Due Process & State Created Danger." (Am. Compl. at ¶¶ 124–137.) Because Section 1983 is not itself a source of substantive rights but merely a method for vindicating rights secured through the United States Constitution or other federal law, *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002), the threshold question here is whether Plaintiff "has sufficiently alleged a deprivation of a constitutional right." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 241 (3d Cir. 2016).

In claiming that Defendants deprived Plaintiff of a constitutional right, Plaintiff invokes the substantive portion of the Fourteenth Amendment's due process clause (Am. Compl. at ¶ 135), which protects individual liberty against certain governmental action "regardless of the fairness of the procedures used to implement them." *L.R.*, 836 F.3d at 241. According to Plaintiff, she alleged in Count II that Defendants deprived her of her due process right to bodily integrity on two different theories—one "on a Substantive Due Process Theory and [one on] a State Created Danger theory." (Pl.'s Br. at 27; Am. Compl. at ¶ 135.)[4] The Court construes

---

[3] Rather than dismiss the entire Amended Complaint because Plaintiff filed it in violation of the Local Rules, the Court will address the merits of Counts II and III, as they are fully briefed.

[4] Plaintiff also argues that she alleged an Equal Protection violation. (Pl.'s Br. at 38.) But the Court need not analyze that claim because it is not pled in the Amended Complaint. Count II, by its own terms, states a claim "*specifically for the substantive due process violation of Plaintiff's right to bodily integrity* . . . based upon the state's actions and for creating a danger." (Am. Compl. at ¶ 135 (emphasis added).) "If Plaintiff wishes to assert claims other than what she explicitly pleads, she must clearly and specifically allege them." *Martin v. Cty. of Atl.*, No. 18-cv-11931, 2019 WL 1012011, at *7 n.8 (D.N.J. Mar. 4, 2019) (declining to consider false arrest

Plaintiff's statement to mean that she intends to assert two theories of bodily integrity liability: one under the state-created danger doctrine, and one non-state-created danger theory that invokes ordinary due process principles under Section 1983. Yet neither theory supports a plausible claim here.

### 1. State-Created Danger

Plaintiff fails to plausibly allege that Defendants violated her due process right to bodily integrity under the state-created danger doctrine, which operates as one of two "exception[s] to the general rule that the Due Process Clause imposes no duty on states to protect their citizens from private harm." *L.R.*, 836 F.3d at 242.[5] Under the state-created danger exception, the state must protect citizens from private acts "where the state acts to *create* or *enhance* a danger that deprives a person of his or her Fourteenth Amendment right to substantive due process." *Sanford*, 456 F.3d at 304 (emphasis in original).

Here, the parties dispute whether the state-created danger doctrine applies. Defendants contend that it is not applicable because Super is a *state actor*, and the state-created danger doctrine simply operates as an exception to the rule that the state need not protect citizens from *private* harms. (Defs.' Br. at 24–25.) Although Plaintiff recognizes and does not dispute this

---

claim referenced in an opposition brief because the brief could not amend the complaint, which contained no such claim).

[5] The second exception to this general rule imposes a duty on states to protect citizens from private acts when a "special relationship" exists between the plaintiff and the state. *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006). Although Plaintiff argues that this exception applies in her brief, the Court need not analyze it because Count II does not allege a "special relationship" claim, but only a state-created danger claim. *See Martin*, 2019 WL 1012011, at *7 n.8; *see also Kneipp v. Tedder*, 95 F.3d 1199, 1209 n.27 (3d Cir. 1996) ("We view the 'state-created danger' relationship to be different than the 'special relationship' required by *DeShaney* to impose liability under section 1983.").

premise, she implies—without citation or elaboration—that the doctrine applies more broadly whenever, as here, a plaintiff "alleges that the state actors assisted in creating and increasing the danger" faced. (Pl.'s Br. at 27.)

The Court rejects Plaintiff's unsupported assertions, much like another court in this circuit recently did in the face of a similar argument. *See Green v. Mount Carmel Area Sch. Dist.*, No. 18-cv-02218, 2019 WL 1787592, at *8 n.63 (M.D. Pa. Apr. 24, 2019) (dismissing state-created danger claim and questioning "whether a state created danger claim is available to [the plaintiff] at all" when the plaintiff "cite[d] no case law to support [her] statement" that although the doctrine "is typically pleaded in cases where non-state actors cause the ultimate harm, the doctrine is not so specifically confined"). In fact, another court in this circuit has accepted the same argument that Plaintiff makes here in granting a motion to dismiss. *See McGhee v. City of Philadelphia*, No. 02-cv-8992, 2003 WL 22518759, at *2 (E.D. Pa. Oct. 23, 2003) (finding that the state-created danger doctrine had "no place here because the act of violence was committed by . . . a public actor, and not by a private citizen"). Accordingly, and without any well-supported reason from Plaintiff to believe that the doctrine applies, the Court will not allow her state-created danger theory of liability to proceed at this time.

### 2. Non-State-Created Danger Due Process Claim

Plaintiff's non-state-created danger theory of bodily integrity liability fares no better. To allege a substantive due process claim, a plaintiff must plausibly allege that "the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. St.*, 523 F.3d 200, 219 (3d Cir. 2008).

Here, there is no dispute that the Fourteenth Amendment protects Plaintiff's right to bodily integrity. *See Black by Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 709 n.1 (3d Cir. 1993). Instead, the parties dispute whether the conduct alleged shocks the Court's conscience. (Pl.'s Br. at 29–32, 42–43; Defs.' Br. at 10–18.) But the conduct on which they focus is that of Super—not Defendants.[6] And for Section 1983 liability to attach, a defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir. 1988).

Assuming that Super's sexual misconduct is conscience shocking,[7] Plaintiff attempts to show Defendants' personal involvement in it by arguing that "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Plaintiff appears to invoke the last point: that Defendants had knowledge of and acquiesced in Super's alleged bodily integrity violations. (Pl.'s Br. at 44–47.)

The parties agree on the inquiry the Court should conduct in assessing whether Defendants knew of and acquiesced in Super's sexual misconduct. (*Id.*; *see also* Defs.' Br. at

---

[6] To the extent Plaintiff suggests that each of the Defendants engaged in their own conscience shocking acts, the Court disagrees. As currently pled, any such claim (which Plaintiff does not clearly make) would appear based on the notion that Defendants knew of Super's sexual predation towards Plaintiff yet continued to send her into his classroom. (Pl.'s Br. at 42.) But as the Court will explain, Plaintiff has not alleged enough about what each of the Defendants actually knew. Thus, any such claim is not plausible.

[7] Despite Defendants' arguments to the contrary, the Court assumes for purposes of this motion that Super's conduct is conscience shocking—an issue of little consequence given the other defects described below.

28–30.) As they agree, "courts in this Circuit have adopted the Fifth Circuit Court of Appeals' test for determining whether a supervisory official can be liable when a subordinate violates a student's right to bodily integrity," which requires plausible allegations that:

> (1) the [supervisory] defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student;
> (2) the [supervisory] defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and
> (3) such failure caused a constitutional injury to the student.

*Jankowski v. Lellock*, No. 13-cv-194, 2014 WL 1017880, at *4–5 (W.D. Pa. Mar. 17, 2014) (citing cases); *see also Thomas v. Bd. of Educ. of Brandywine Sch. Sch. Dist.*, 759 F. Supp. 2d 477, 496 (D. Del. 2010); *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 709 (E.D. Pa. 2007).

"The district courts in this Circuit that have adopted this test for supervisory liability have done so because it is consistent with years of precedent" from the Third Circuit "indicating that supervisory liability requires that the supervisor 'had knowledge of and acquiesced in' the subordinate's violations." *Jankowski*, 2014 WL 1017880, at *5 n.3 (quoting *Graham v. Ambridge Area Sch. Dist.*, No. 07-cv-1640, 2010 WL 2207999, at *10 (W.D. Pa. May 26, 2010)). The Third Circuit's "knowledge and acquiescence" caselaw requires a defendant to have actual, personal knowledge of the violation—constructive knowledge does not suffice. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). "Allegations of . . . actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207–08 (citing *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980)).

Here, Plaintiff contends that her allegations plausibly suggest that Defendants knew of facts or a pattern of inappropriate sexual behavior that pointed plainly toward the conclusion that Super was sexually abusing Plaintiff. (Pl.'s Br. at 43, 45–47.) But her supporting allegations are deficient for at least two reasons—either they are insufficiently vague and fail to implicate knowledge of specific Defendants, or they implicate specific Defendants but fail to adequately allege that they knew of conduct that pointed plainly toward the conclusion that Super was sexually abusing Plaintiff.

a. Non-Specific Knowledge Allegations

In support of her claim that Defendants knew about the inappropriate sexual conduct between Super and Plaintiff, Plaintiff largely provides generalized allegations about "Defendants" as a group in addition to bald assertions that one or all of them knew of Super's sexual misconduct. (Am. Compl. at ¶¶ 18, 20, 60–62, 68, 98, 102, 114, 115(c), 116(c), 120(h), 127, 140.) Of course, conclusory assertions are not sufficient. *See Iqbal*, 556 U.S. at 680. Nor will this Court "impute generalized allegations" about Defendants as a group "onto specific Defendants" to conclude what each of them knew. *Lentz v. Taylor*, No. 17-cv-4515, 2019 WL 1091392, at *12 (D.N.J. Mar. 8, 2019) (finding general allegations as to defendants as a group insufficient to survive a motion to dismiss).

Nor can Plaintiff plausibly allege that Defendants possessed the requisite knowledge of Super's sexual misconduct by trying to impute what third parties knew onto Defendants. (Pl.'s Br. at 45–47.) Plaintiff argues, for instance, that that the Court should infer that Monahan and Sullivan "had actual knowledge of the same inappropriate behaviors" that other "teachers observed and the rumors [they] overheard." (Pl.'s Br. at 45; *see also* Am. Compl. at ¶¶ 37, 38, 82–87.) But even viewed in the light most favorable to Plaintiff, her allegations about the

knowledge of third parties like Coia and Quackenbush do not give rise to a plausible inference that *Defendants* actually knew the same information. *See Chavarriaga*, 806 F.3d at 222; *Evancho*, 423 F.3d at 353. In fact, in discussing the knowledge requirement under the *Monell* "policy or custom" doctrine, the Third Circuit has stated that absent "any direct complaints made to school officials, the mere floating around of unsubstantiated rumors regarding a particular employee—particularly in the high school setting, which is notoriously rife with adolescent gossip—does not constitute the kind of notice for which a school district can be held liable." *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 144 (3d Cir. 2002). Without additional factual averments, Plaintiff's inference is a bridge too far.

> b. Defendant-Specific Knowledge Allegations

Plaintiff's more specific factual allegations about Defendants themselves also fail to support a plausible bodily integrity claim. *See Jankowski v. Lellock*, 649 F. App'x 184, 186 (3d Cir. 2016) ("We must, therefore, look at each defendant's own actions as alleged in the complaint.").

As to Monahan, Plaintiff alleges that Monahan knew Super "typically ate with students," including Plaintiff, had spoken to Super about "his interactions with [Plaintiff]," and had a "hunch" and a "feeling" that "something was not right." (Am. Compl. at ¶¶ 70–71.) But mere knowledge that Super ate lunch with Plaintiff and a vague thought that "something" was not right or "normal" does not, without more, plausibly suggest that Monahan knew Super had targeted Plaintiff with inappropriate "sexual behavior," let alone that Monahan knew facts that pointed "plainly" toward that conclusion, even if she decided to speak with him about the propriety of interactions. As the Third Circuit has stated, "[w]hile it is fair to say that an allegation of 'something funny' going on between a student and [staff member] should have been

cause for concern . . . we are unwilling to say that this allegation alone, without evidence of any specific mention of sexual harassment or abuse put [the recipient of that information] on notice as to an ongoing constitutional violation by [a staff member]." *Johnson*, 283 F.3d at 144 n.1.

The same is true of Plaintiff's allegation that Monahan knew Plaintiff cut herself. Of course, such behavior is no small matter. But its causes could be many. And Plaintiff alleges no facts to plausibly suggest that Monahan or any other defendant knew of information to trace Plaintiff's cutting back to Super's predation. In other words, mere knowledge that Plaintiff cut herself does not reasonably signal that Super was sexually abusing or even interacting with her.

Plaintiff similarly fails to plausibly suggest that Monahan and Sullivan knew of Super's sexual misconduct based on the School's Barracuda network monitoring software. In claiming otherwise, Plaintiff argues that Monahan and Sullivan were designated as "administrators" of the monitoring system and thus received automatic alerts when Super sent his many explicit messages to Plaintiff. (Pl.'s Br. at 46.) But as Defendants correctly note, Plaintiff does not actually allege that Monahan or Sullivan were designated as "administrators" of the monitoring system such that they received these alerts. (Am. Compl. at ¶¶ 60–62.)[8]

The Court is also unable to infer from the allegations—even viewed in the light most favorable to Plaintiff—that Monahan and Sullivan were designated as network "administrators"

---

[8] Plaintiff also suggests that Monahan and Sullivan received the alerts sent to network "administrators" because they were "administrators" within the Vineland Board of Education. (Pl.'s Br. at 46.) But the Amended Complaint does not contain facts that allow the Court to equate a school "administrator" with a network "administrator" who received alerts of suspicious network activity. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983) (explaining that it is "not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged" in deciding a motion to dismiss). Similarly, Plaintiff has not suggested that Defendants possessed the required knowledge by resting on Vineland Policy 2362.1, which states that any pupil's use of internet "live chat" capabilities "will be directly supervised by an administrator, faculty, or staff member." (Am. Compl. at ¶ 32.) Again, Plaintiff does not allege that Defendants were designated as such administrators.

because of the group pleading problem explained above.  In fact, Plaintiff's own argument underscores why making that inference from Plaintiff's vague group pleading is problematic. (Pl.'s Br. at 46 (citing Am. Compl. at ¶¶ 61–62; *see also id.* at ¶ 66).)  In the Amended Complaint, the term "Defendants" refers to the Vineland Board itself, Gruccio, Monahan, and Sullivan.  (Am. Compl. at p. 1–2.)  But in pointing to her allegation that "Defendants" ignored the alerts sent to designated network "administrators," Plaintiff does not argue that *Gruccio* would have received them, even though she is among the "Defendants."  Instead, Plaintiff argues that her allegations showed that *Monahan and Sullivan* received them, as well as other individual *unnamed members* of the Vineland Board who seemingly would not be contemplated by the term "Defendants" as used in the Amended Complaint.  If Plaintiff herself is not clear on what her group allegations suggest, the Court cannot be either.  Plaintiff must clarify the pleadings to allege Defendants' personal involvement.

Finally, the Court rejects Plaintiff's suggestion that Defendants possessed the requisite knowledge because they knew of a pattern of inappropriate sexual behavior by others "within the Vineland Board of Education."  (Pl.'s Br. at 43.)  To support this claim, Plaintiff implicates her allegations against Gruccio that pertain to her knowledge of "another matter of alleged discrimination within the school district stemming from [a] known inappropriate relationship between a staff member and a student."  (Pl.'s Br. at 43, 47.)  But Plaintiff cannot plausibly allege that Gruccio knew of *Super's behavior towards Plaintiff* or a pattern of inappropriate sexual behavior pointing plainly toward sexual abuse or misconduct based on her allegations about this *different* incident when its surrounding facts and circumstances are not pled.  (Am. Compl. at ¶¶ 103–114.)  Nor can Plaintiff suggest that pattern by relying on the conclusory

assertions that Monahan and Sullivan "had actual knowledge of harassment and discrimination in the school's programs." (*Id.* at 115(c), 116(c).)

In sum, Plaintiff must cure these and any other defects that may exist in her pleading before she may proceed with Count II. Although the Court does not take Plaintiff's allegations lightly, Count II is not plausible as pled.

## C. *Monell* **Liability (Count III)**

Finally, Plaintiff fails to allege plausible claims in Count III, which asserts several theories of liability based on the Supreme Court's decision in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1986). *Monell* "established that government officials could be held liable for policies and practices which they established and maintained." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 729 (3d Cir. 1989).

Here, Plaintiff argues that Defendants "developed and maintained numerous deficient policies and/or customs . . . which caused the deprivations of [her] Constitutional Rights." (Pl.'s Br. at 48.) Specifically, Plaintiff alleges that Defendants: (1) failed to train and supervise their employees to protect against sexual harassment and discrimination of students; (2) failed to train employees to protect students who exhibit signs of self-destruction; (3) failed to discipline Super after having knowledge of Super's sexual misconduct with Plaintiff; and (4) failed to follow several policies and/or customs that encouraged and allowed Super to violate Plaintiff's Fourteenth Amendment rights, including the School's policies relating to electronic communication monitoring, harassment, inappropriate staff conduct, suicide prevention, and staff supervision. (Am. Compl. at ¶¶ 139–143.)

None of these theories support plausible claims. As to Plaintiff's failure to train, supervise, and discipline theories, the Third Circuit has held that a "failure to train, discipline or

control can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997)).

But as explained above, Plaintiff alleges no facts to plausibly suggest that Defendants had contemporaneous knowledge of Super's sexual misconduct or even a "pattern of similar incidents."[9] *See M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 424 (M.D. Pa. 2014) (dismissing *Monell* claims in teacher sexual misconduct case absent contemporaneous knowledge of teacher's relationship with student and rejecting attempt to show a "pattern" of violations based on a different sexual encounter at a different school because the "nexus" between the incidents was "too attenuated"). Plaintiff's additional *Monell* theory that Defendants failed to discipline Super after having knowledge of his sexual misconduct fails for these same reasons.

Plaintiff's final *Monell* theory—that Defendants maintained a policy/custom that caused the alleged violation—fails for a similar reason. At bottom, Plaintiff's claim is that Defendants are liable because they failed to enforce their relevant policies or customs. (Am. Compl. at ¶ 143). Although the "fail[ure] to act affirmatively at all" may be actionable, it requires

---

[9] Even if Monahan or other Defendants knew that Plaintiff cut herself, Plaintiff's claim that Defendants failed to train staff on the "proper protocol to protect students . . . who exhibit signs of self-destruction" is still not plausible. (Am. Compl. at ¶ 139.) Plaintiff does not allege a specific deficiency in any training program that is "closely related to [her] ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989) (explaining that the failure to train inquiry is whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect").

allegations that Defendants acted with "deliberate indifference" to an "obvious" need to take some action. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (listing the three situations when "acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983").

But as another court in this Circuit has explained in analyzing a similar sexual misconduct claim against a school, a plaintiff alleging deliberate indifference in the "failure-to-act" context must ordinarily "allege that the municipality was aware of a 'pattern of similar constitutional violations'" committed by its employees in the past "yet still declined to act." *Jankowski v. Lellock*, No. 13-cv-194, 2013 WL 5945782, at *7–8 (W.D. Pa. Nov. 6, 2013); *see also Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 176 (3d Cir. 2001) (explaining that a plaintiff may allege a causal connection between the policy or custom and her constitutional injury by alleging that "policymakers were aware of similar conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [the plaintiff's] injury" (citation omitted)).[10] Here, however, Plaintiff alleges no such a pattern. *See Jankowski*, 2013 WL 5945782, at *8 ("Without pleading such a pattern, there is no way to establish that the School District should have taken any further action."). At most, Plaintiff's allegations may suggest that Defendants' alleged failure to enforce compliance with its written policies and to monitor its electronic communications, networks, technology and its staff conduct

---

[10] Plaintiff does not invoke the "single-incident" exception that, "in certain rare cases," may permit a plaintiff to suggest deliberate indifference without alleging "a pattern of previous constitutional violations." *Jankowski*, 2013 WL 5945782, at *8 (citing *City of Canton*, 489 U.S. at 390 n.10); *see also M.S.*, 43 F. Supp. 3d at 425.

was grossly negligent.  But that is not "deliberate indifference."  *Id.*  As pled, Count III is not plausible.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED**, and Counts I, II, and III of Plaintiff's Amended Complaint are **DISMISSED**.  Having dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  However, the Court will grant Plaintiff leave to amend—consistent with Local Civil Rule 15.1(b)—if she so desires.  *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).  An appropriate Order shall issue.


Dated: June 4, 2019                                         s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge